805 So.2d 166 (2002)
STATE of Louisiana
v.
John W. WEAVER, et al. "Mullet Cases".
No. 2001-KA-0467.
Supreme Court of Louisiana.
January 15, 2002.
*168 Richard P. Ieyoub, Attorney General, John F. Rowley, District Attorney, Darren M. Roy, Arabi, Counsel for Applicant.
Alfonse S. Monteferrante, Claude S. Mumphrey, II, John W. Mumphrey, Wayne B. Mumphrey, Chalmette, Counsel for Respondent.
JOHNSON, Justice.[*]
The trial court found that LSA-R.S. 56:333(F), which provides for a lifetime revocation of a commercial mullet fishing license or permit for violations of fishery laws and regulations, violates the due process and equal protection clauses of the constitution, as well as the constitutional provisions prohibiting excessive punishment. The state suspensively appealed that judgment to this court pursuant to La. Const. Art. V, § 5(D). After a review of the record, we hold that the trial court erred in finding that the penalty under LSA-R.S. 56:333(F), as it existed at the time defendants were charged, was excessive and violative of due process and equal protection. Accordingly, we reverse the trial court's ruling.

FACTS AND PROCEDURAL HISTORY
Defendants, John W. Weaver, Chris Battle, Bronson D. Dunnam, Kenneth Lefebvre, Samuel M. Baker, Donald A. Daggett, and Christopher Polk, Lawrence W. Nuccio and Peter L. Ciaccio, have been charged with various violations of LSA-R.S. 56:333, the statute which governs the commercial taking of mullet. Specifically, Weaver, Battle, Dunnam, and Lefebvre, were charged with taking commercial mullet during illegal hours in violation of LSA-R.S. 56:333(B)(1). Weaver was also charged with taking mullet commercially without a permit, a violation of LSA-R.S. 56:333(B)(3). Baker, Daggett, and Polk, were charged with using a mullet strike net in excess of 1200 feet in violation of LSA-R.S. 56:333(B)(4). Nuccio and Ciaccio, were charged with violating LSA-R.S. 56:333(B)(4), using more than one strike net.
Defendants moved to quash the bills of information. On September 16, 2000, the trial court granted the motions. Further, the trial court declared LSA-R.S. 56:333(F) unconstitutional, stating:
[L]a.R.S. 56:333(F) is invalid and unconstitutional as denying due process and equal protection under the laws and requiring imposition of excessive punishment in violation of Article I, §§ 2, 3 and 20, La. Const.1974, and the Eighth and Fourteenth Amendments to the United States Constitution.
The state now seeks review of that ruling.[1]

DISCUSSION
Defendants were all charged with violating various provisions LSA-R.S. 56:333(B) which provides:

*169 B. (1) The season for taking mullet shall begin on the third Monday in October of each year and remain open until the third Monday in January. There shall be no commercial taking of mullet during the period from 5:00 a.m. on Saturday through 6:00 p.m. on Sunday. Mullet may not be taken commercially at any time outside of this season. There shall be no fishing pursuant to the provisions of this Section during the hours after sunset and before sunrise. The provisions of this Section are subject to quotas and size limits as established by law and rules and regulations of the commission.
(2) Mullet may only be taken commercially with a mullet strike net.
(3) The commercial taking of mullet is prohibited except by special permit issued by the Department of Wildlife and Fisheries at a cost of one hundred dollars for residents of this state and four hundred dollars for those who are non-residents.
(4) The commercial taking of mullet during the season by using a mullet strike net in excess of one thousand two hundred feet in length or by using more than one strike net from any vessel at any time is prohibited.
(5) Each mullet strike net shall have attached to it a tag issued by the department which states the name, address, and social security number of the owner of the net and the permit number of the permit issued to commercially take mullet. The department shall not issue any tag to a person who does not have a social security number.
At the time of defendants' alleged violations, the penalty provisions of LSA-R.S. 56:333 provided:
* * *
F. Any person convicted of any offense involving fisheries laws or regulations shall forfeit any permit or license issued to commercially take mullet and shall be forever barred from receiving any permit or license to commercially take mullet. Any person who, after having been barred from the commercial mullet fishery pursuant to this Subsection, violates any provision of this Section shall be penalized under the provisions of a Class 7-B violation, R.S. 56:37.[2] (Emphasis added)
* * *
I. Except as provided in Subsection F of this Section, a violation of the provisions of this Section or of any of the regulations adopted pursuant thereto shall be a class six violation, R.S. 56:36.[3]
Initially, we note that LSA-R.S. 56:333(F) was amended by Act 147 of 2001, and LSA-R.S. 56:333(I) has been repealed in its entirety.[4] In oral argument of the *170 matter, defendants implied that they should receive the benefit of the amendment to the statute. Defendants were all charged by bill of information between December, 1997 and February, 2000 for offenses which occurred between November, 1997 and December, 1998. Act 147 did not become effective until August 15, 2001.[5] A defendant is to be tried under the statute in effect at the time of the commission of the crime. That a statute is subsequently amended to modify or lessen the possible penalty does not extinguish liability for the offense committed under the former statute. LSA-R.S. 24:171; State v. Narcisse, 426 So.2d 118 (La.1983), cert. denied, Narcisse v. Louisiana, 464 U.S. 865, 104 S.Ct. 202, 78 L.Ed.2d 176 (1983). Thus, our discussion is limited to LSA-R.S. 56:333(F) as it existed at the time defendants herein were charged.
Generally, statutes are presumed constitutional, and any doubt is to be resolved in the statute's favor. State v. Brenner, 486 So.2d 101, 103 (La.1986); Theriot v. Terrebonne Parish Police Jury, 436 So.2d 515, 520 (La.1983). The party challenging the constitutionality of a statute bears a heavy burden in proving that statute to be unconstitutional. State v. Brooks, 541 So.2d 801, 811 (La.1989); State v. Griffin, 495 So.2d 1306, 1308 (La. 1986). As to equal protection, both the United States Constitution and the Louisiana Constitution require that there exist a rational basis for laws which discriminate between similarly situated groups of persons (who are not members of a "suspect class"). See Marshall v. United States, 414 U.S. 417, 422, 94 S.Ct. 700, 704, 38 L.Ed.2d 618 (1974); State v. Brown, 94-1290, p. 6 (La.1/17/95), 648 So.2d 872, 876.
Notwithstanding defendants' claims to the contrary, their status as commercial fishermen does not constitute a suspect class, nor does commercial fishing amount to a fundamental right. Thus, as the state argues, the "ability to hold any type of commercial fishing license is a privilege and revocation of that privilege is justified whenever a fisherman refuses to strictly adhere to the fisheries laws." See Williamson v. Lee Optical, 348 U.S. 483, 488, 75 S.Ct. 461, 464, 99 L.Ed. 563 (1955) (the right to pursue a particular occupation is not fundamental for equal protection purposes); see also Dandridge v. Williams, 397 U.S. 471, 486-488, 90 S.Ct. 1153, 1162-1163, 25 L.Ed.2d 491 (1970) (the right to pursue employment opportunities is not sufficiently fundamental as to warrant *171 strict scrutiny); LaBauve v. Louisiana Wildlife & Fisheries Comm'n, 444 F.Supp. 1370, 1382 (E.D.La.1978) (a fisherman's interest in the pursuit of livelihood is economic and is not fundamental within scope of the Equal Protection Clause); Lane v. Chiles, 698 So.2d 260, 263 (Fla.1997) (because fishing is not a fundamental right and commercial fishermen do not constitute a suspect class, the rational basis test applies). Therefore only a rational basis between a legitimate state interest and the provision enacted need support the rule. Marshall, 414 U.S. at 422, 94 S.Ct. at 704.
A review of Louisiana jurisprudence reveals that equal protection challenges to fisheries laws are rare. However, in State v. Wingate, 95-1874 (La.App. 1 Cir. 2/23/96), 668 So.2d 1324, the First Circuit upheld a statute prohibiting the possession of undersized catfish. In that case, in the defendant's view, the statute amounted to an unconstitutional denial of equal protection because wholesale/retail dealers who possessed undersized crabs could avoid criminal penalties by providing to Wildlife and Fisheries agents the identity of the commercial fisherman from whom they purchased undersized crabs, whereas no similar provision existed for wholesale/retail dealers who possessed undersized catfish. The court of appeal rejected the defendant's argument, reasoning that "the legislature has identified specific, different enforcement problems in the harvesting, possession, and sale of undersized crabs than in the taking, possession, or sale of undersized catfish." The court further noted that differences among the various species of fish dictated different rules and regulations in order to protect each species; thus, the defendant's claim of unequal treatment lacked merit. Wingate, 95-1874, 668 So.2d at 1328-1329.
Also instructive on this issue is People v. Hamm, 149 Ill.2d 201, 172 Ill.Dec. 179, 595 N.E.2d 540 (1992), an Illinois case concerning a statute which provided felony sanctions when the perpetrator knowingly possessed, captured, or killed protected aquatic life for commercial purposes. The defendant fishermen contended that no rational basis existed for punishing a commercial fisherman as a felon for engaging in illegal fishing practices when the penalty constituted a mere misdemeanor if a sport fisherman committed the same violation. However, the Illinois Supreme Court disagreed, noting that the disparate treatment of commercial and sports fishermen was justified based on "the monetary incentive in commercial fishing and fishing for profit, and the capability of commercial fishermen to remove large amounts of fish from Illinois waters." Hamm, 172 Ill.Dec. 179, 595 N.E.2d at 544.
It is well-settled that a state's police powers include safeguarding the wildlife and fisheries for the benefit of its people. La. Const. art. IX, § 1; see State v. McHugh, 92-1852 (La.1/6/94); 630 So.2d 1259, 1264-1265. A review of the legislative history shows that the instant statute was enacted pursuant to the state's police powers as a conservation measure. Specifically, the House Natural Resources Committee heard testimony that a mullet management plan was necessary to protect the species as a renewable resource due in part to the increase of mullet fishermen from Florida fishing in Louisiana. MINUTES, HOUSE NATURAL RESOURCES COMMITTEE, May 30, 1991, p. 3. According to the Coastal Fisheries Institute, the most intense fishing effort for mullet occurs during the spawning season, as mullet roe is the most valuable mullet product marketed.[6] COASTAL FISHERIES INSTITUTE, LOUISIANA *172 STATE UNIVERSITY, Commercial Mackerel, Snapper, Grouper, Black Drum, Mullet, and Inshore Shrimp Fisheries Research Program in Louisiana, Annual Report May 1985, at 61-64. Research shows that the harvest for mullet roe increased in the early 1990's but declined after 1995 as a result of the instant statute which was designed to eliminate the commercial taking of mullet outside of the spawning season as well as to criminalize commercial fishing for mullet at night, on weekends, in freshwater areas, and using gear other than strike gill nets. The most recent mullet stock assessment indicates that since the enactment of R.S. 56:333, mullet "are not being harvested at a rate that would drive the stock below the target SPR [spawning potential ratio] of 30% established by the Louisiana Legislature." See WILDLIFE AND FISHERIES COMMISSION, Mullet Stock Assessment, January 30, 2001, at 9-10.
Against this backdrop, the lifetime ban set out in R.S. 56:333(F) has a rational purpose, namely, to operate as a shield against the depletion of the local mullet supply by targeting fishermen who make the most concentrated catches of mullet. Thus, the penalty merely acknowledges the fact that commercial fishing, when done contrary to the fisheries regulations more severely threatens the state's natural resources than sport fishing. By way of example, recreational fishing for mullet is "relatively light, typically less than 200,000 pounds of fish per year" whereas the figures from 1999 reveal that the commercial harvest of mullet amounted to 8,893,373 pounds. See WILDLIFE AND FISHERIES COMMISSION, Mullet Stock Assessment, January 30, 2001, at 16; see also K. KUPERAN AND JON G. SUTINEN, Blue Water Crime: Deterrence, Legitimacy, and Compliance in Fisheries, 32 LAW & SOC'Y REVIEW 309, 310 (1998) (fishermen "are subject to numerous regulations that constrain their opportunities to earn income, and temptations and opportunities for offending repeatedly occur.") Consequently, the penalty provision of R.S. 56:333(F) is rationally related to the legislature's express purpose of promoting the enhancement of the state's marine resources and does not amount to an equal protection violation.
While the defendants argue that the lifetime revocation of their fishing license or permit appears incongruous when compared with other commercial fishermen and professionals who are not forever banned from pursuing their line of work for violations of the law, it is for the legislature to decide which means of solving a particular problem is most consistent with an overall scheme to conserve and manage valuable fisheries. Therefore, the underinclusive nature of a statute does not render it invalid. See Phillips Chemical Co. v. Dumas Independent School Dist., 361 U.S. 376, 385, 80 S.Ct. 474, 480, 4 L.Ed.2d 384 (1960) ("Even if the classification involved here is to some extent both underinclusive and overinclusive, and hence the line drawn by Congress imperfect, it is nevertheless the rule that in a case like this perfection is by no means required."); Morgan v. State, 470 S.W.2d 877, 880 (Tex.Crim.App.1971)(concluding that because a statute allows other methods for taking fish does not place it in violation of the Equal Protection Clauses of the federal and state constitution); see also National Fisheries Inst., Inc. v. Mosbacher, 732 F.Supp. 210, 220 (D.D.C.1990) ("[We] will *173 not construe the Magnuson Act to tie the Secretary's hands and prevent him from conserving a given species of fish whenever its very nature prevents the collection of complete scientific information").
Moreover, in State v. Baxley, 94-2982 (La.5/22/95), 656 So.2d 973, 979, this Court held that "the punishment of one type of conduct more severely than another similar type of conduct is not, of itself, an equal protection violation." While the constitutional challenge in Baxley involved whether R.S. 14:89(A)(2) arbitrarily and discriminatorily punished homosexuals more than heterosexuals, (based on a comparison of the penalty provisions of the crime against nature statute and the prostitution statute), the holding equally applies to the instant case; the different punishment of two kinds of different conduct does not constitute an equal protection violation. Cf. State v. Fleury, 01-0871 (La.10/16/01), 799 So.2d 468 (shoplifting statute providing for more severe penalties than the general theft statute not violative of equal protection given widespread problem of retail theft); State v. Smith, 99-0606, p. 17 (La.7/6/00), 766 So.2d 501, 514 (punishing solicitation of crimes against nature, i.e., anal or oral sex, more harshly than solicitation of prostitution does not violate the equal protection clause); State v. Carter, 99-0779, pp. 16-17 (La.App. 4 Cir. 11/17/00), 773 So.2d 268, 280 (defendant, who was convicted of possession of heroin, failed to meet burden of proving that habitual offender statute violated equal protection, when record contained no evidence that statute imposing greater penalty for possession of heroin than possession of cocaine and habitual offender statute are not rationally related to legitimate governmental interest or that statutes do not suitably further appropriate state interest); State v. Wingate, supra, 95-1874, 668 So.2d at 1328 (statute prohibiting possession of undersized catfish did not violate equal protection because seafood dealers possessing undersized crabs were treated differently than those possessing undersized catfish or because channel catfish was the only fresh water or salt water finfish with measurement for collarbone-off (head removed) size limit).
Although the trial court found defendants' due process claim meritorious, as a general matter, to prove a violation of substantive due process, defendants must first establish the existence of a constitutionally-protected property or liberty interest. See Standard Materials, Inc. v. City of Slidell, 96-0684 (La.App. 1 Cir. 9/23/97), 700 So.2d 975, 985-986; Crowley v. Courville, 76 F.3d 47, 52 (2d Cir.1996). However, in Louisiana Seafood Management Council v. Louisiana Wildlife and Fisheries Com'n, 97-1367 (La.5/19/98), 715 So.2d 387, 392, this Court held that:
[T]he lack of any property interest in the fish in the waters is well-settled, statutorily and judicially. See La. Civ. Code arts. 450, 452; La.Rev.Stat. 56:3. In LaBauve v. Louisiana Wildlife & Fisheries Comm'n, 444 F.Supp. 1370 (E.D.La.1978), the court explained that "fish which are at large in state waters are the property of the state, as public or common things;" that "an individual has no proprietary interest in the fish he is prevented from catching;" and that "an individual has no proprietary right to fish commercially in state waters." 444 F.Supp. at 1378.
At any rate, legislation comports with substantive due process if the government action is rationally related to a legitimate government interest; however, if, upon consideration of evidence, the propriety of the government authority's action remains debatable, then there is no substantive due process violation and the action will be upheld. See Standard Materials, Inc., supra, 96-0684, 700 So.2d at 985. As discussed above, the penalty provision is rationally *174 related to the legislature's express purpose of promoting the enhancement of the state's mullet fishery; therefore, the defendants' due process challenge lacks merit.
Finally, the state maintains that the punishment set out in R.S. 56:333(F) is not excessive or grossly disproportionate to the severity of the crime because the instant violations cause great harm to the mullet fishery. On the other hand, the defendants argue that the instant penalty, which applies to a violation of any law or regulation involving fisheries, could result in the "imposition of the death sentence" for a commercial mullet fishermen who merely violates a "law pertaining to the requirement of a current sports fishing license, while fishing with his child, when his fishing license had merely expired without his knowledge." However, the defendants' example is a far cry from what occurred in the instant case as all of the defendants were charged with violations of the mullet taking statute, i.e., taking commercial mullet during illegal hours; taking mullet commercially without a permit; using a mullet strike net in excess of 1200 feet; using more than one strike net. See R.S. 56:333(B)(1);(B)(3);(B)(4).
Nevertheless, in holding the sentencing provision of R.S. 56:333 invalid, the trial court apparently agreed with the defendants' claim that the lifelong ban from commercial mullet taking constitutes an excessive punishment.[7]
A punishment is constitutionally excessive if it makes no measurable contribution to acceptable goals of punishment and is nothing more than the purposeless imposition of pain and suffering and is grossly out of proportion to the severity of the crime. State v. Dorthey, 623 So.2d 1276, 1280 (La.1993). A sentence is grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks the sense of justice. State v. Lobato, 603 So.2d 739, 751 (La.1992). It is a well-established principle that the legislature has the unique responsibility to define criminal conduct and to provide for the penalties to be imposed against persons engaged in such conduct. Dorthey, 623 So.2d at 1278; State v. Woljar, 477 So.2d 80, 81-82 (La.1985). The penalties provided by the legislature reflect the degree to which the criminal conduct affronts society. State v. Ryans, 513 So.2d 386, 387 (La.App. 4th Cir.1987), writ denied, 516 So.2d 366 (La.1988). Courts must apply these penalties unless they are found to be unconstitutional. Dorthey, 623 So.2d at 1278.
In State v. Telsee, 425 So.2d 1251 (La.1983), this Court outlined several factors which are useful in determining whether a sentence, by its excessive length or severity, is grossly out of proportion to the underlying crime. This analysis is cumulative and focuses on a combination of these factors. Id., 425 So.2d at 1253. These factors include the nature of the offense and the offender, a comparison of the punishment with sentences imposed for similar crimes, the legislative purpose behind the punishment, and a comparison of the punishment provided for this crime in other jurisdictions. Id. at 1253-54.
The state, in support of its argument, relies on State v. Hood, 584 So.2d 1238 (La.App. 2 Cir.1991), which appears to be the only Louisiana case addressing the issue of the excessiveness of a punishment *175 imposed pursuant to a wildlife and fisheries violation. See R.S. 56:320 (criminalizing the taking of game fish with wire baskets); R.S. 56:346 (providing for period of incarceration from 60 days to 12 months "without suspension thereof"). The court of appeal acknowledged the harshness of the penalty, but concluded that:
The legislature's choice of punishment for taking game fish by illegal means is not unreasonably related to the preservation of a finite natural resource and is a matter of substantial regulatory interest to the lawmaking branch of government in a state which prides itself as the "sportsman's paradise." Failure to vigorously discourage activities which deplete the state's supply of game fish could easily result in a paradise lost. Id. at 1242.
Therefore, the Second Circuit found that in "considering the danger which fish and game violators pose to the natural resources of the state ... the punishment makes a measurable contribution to acceptable goals of punishment and is not grossly out of proportion to the severity of the offense." Id.
The same principles apply to the penalties under attack in the instant case. As discussed supra, the legislature enacted stiffer penalties concerning commercial fishing as part of maintaining the health of the mullet industry. Furthermore, while the lifetime ban from commercial mullet taking for a violation of any fisheries regulation appears harsh, it does not constitute excessive punishment in light of the state's interest in protecting Louisiana's natural resources which includes aquatic life. See State v. Hood, supra. Finally, the penalty is not meted out arbitrarily or capriciously given that the same punishment is found in the statutes concerning spotted seatrout and saltwater finfish. See LSA-R.S. 56:325.3(F)(spotted seatrout); LSA-R.S. 56:325.4(C)(saltwater finfish). Clearly, this determination is within the province of the legislature. If the penalty is not reflective of current conservation policies, it is for the legislature, not the courts, to reflect this change. For all of these reasons, the sentencing provision under R.S. 56:333(F) is not unconstitutionally excessive, and the trial court erred in holding otherwise.
Accordingly we hold that the trial court erred in finding that the penalty under R.S. 56:333(F), providing for a lifetime revocation of a commercial mullet fishing license or permit, is excessive and violative of due process and equal protection. Contrary to the trial court's finding, the harsher punishment is rationally related to the legislature's express purpose of promoting the enhancement of the state's mullet fishery, and therefore, does not amount to an equal protection violation given the capability of commercial fishermen to move large amounts of mullet out of Louisiana waters.
REVERSED.
NOTES
[*] Retired Judge Robert L. Lobrano, assigned as Justice Pro Tempore, participating in the decision.
[1] Pursuant to La. Const. art. V, § 5(D), a case shall be appealable to this Court if a law or ordinance has been declared unconstitutional.
[2] LSA-R.S. 56:37 provides in relevant part:

A. Class seven shall be divided into 7-A and 7-B violations.
* * *
(2) The following penalties shall be imposed for a class 7-B violation: For each offense, the fine shall be not less than five thousand dollars nor more than seven thousand five hundred dollars and imprisonment for one year.
[3] LSA-R.S. 56:36 provides:

The following penalties shall be imposed for a class six violation. For each offense, the fine shall be not less than nine hundred dollars nor more than nine hundred fifty dollars, or imprisonment for not more than one hundred twenty days, or both, and shall include the forfeiture to the commission of anything seized in connection with the violation.
[4] LSA-R.S. 56:333(F) was amended by Act 147 of 2001. The amended statute provides:

Violation of any provision of this Section or of any Wildlife and Fisheries Commission regulation pertaining to mullet fishery shall constitute a Class 6 violation. The offender shall also be penalized as follows:
(1) (a) For a first offense, the offender shall forfeit any mullet permit or mullet strike net license issued to him and shall be barred from obtaining a mullet permit or a mullet strike net license for the remainder of the period for which it was issued plus one year, during which the offender shall be barred from participating in any mullet fishery.
(b) For a second offense, the offender shall forfeit any mullet permit or mullet strike net license issued to him and shall be barred from obtaining a mullet permit or a mullet strike net license for the remainder of the period for which it was issued plus two years, during which the offender shall be barred from participating in any mullet fishery.
(c) For a third offense, the offender shall forfeit any mullet permit or mullet strike net license issued to him and shall be forever barred from obtaining a mullet permit or a mullet strike net license and from participating in the mullet fishery.
(2) Any person who participates in the fishery while barred shall be penalized under the provisions of a Class 7-B violation.
[5] The general effective date of laws enacted at the 2001 Regular Session is August 15, 2001. See La. Const. Art. III, § 19.
[6] Mullet roe is chiefly marketed to Japan and Taiwan. Few, if any, marketable mullet products are sold in Louisiana. During the off-season of the mullet roe fishery, mullet is sold as bait. COASTAL FISHERIES INSTITUTE, LOUISIANA STATE UNIVERSITY, Commercial Mackerel, Snapper, Grouper, Black Drum, Mullet, and Inshore Shrimp Fisheries Research Program in Louisiana, Annual Report May 1985, at 61-64.
[7] This Court pretermitted the question of whether the sentencing provision of R.S. 56:333(F) was unconstitutionally excessive in State v. Alfonso, 99-1546, p. 11 (La.11/23/99), 753 So.2d 156, 163, after finding that the Wildlife and Fisheries Commission exceeded its statutory authority by adopting administrative rules criminalizing the failure to comply with the monthly reporting requirements for the taking of mullet.